The opinion of the court was delivered by
Nicholls, C. J.
Counsel of plaintiffs, on the argument, conceded that their demand was barred by prescription unless they could succeed in sustaining the position contended for by them that the only prescription applicable to it was that of thirty years.
They contend that the present is substantially a petitory action; that the property of the succession is in the illegal possession of defendant, under guise of a succession administration which had no reality but was a fraudulent simulation concocted by him to despoil the widow and heirs of the deceased of their p; operty; that without authority he opened the succession and employed an attorney to conduct the mortuary proceedings, who, under false representations received from his employer, made to the court recitals of fact which were absolutely without foundation, to the effect that the deceased was heavily indebted to him; that on the strength of these false statements the court was induced to issue an order for the convocation of a family meeting on behalf of the minors to consider the necessity and propriety of a sale of the real estate in order to pay his and other claims against the succession; that the family meeting *1340 so ordered, acting also on the faith of these false representations, recommended a sale, and their proceedings were erroneously and improvidently, through the fraud of defendant, homologated by the court and a sale ordered; that a sale followed for cash, instead of on the terms fixed by the family meeting, at which an adjudication was made to defendant; that he paid no portion of the price, but illegally retained it, under pretence of holding a large claim against the succession; that he subsequently fraudulently caused the homologation of what purported to ' be an account of tutorship filed by her, in which she is made to recognize his claims and consent to their being paid out of the proceeds of the sale; that throughout these whole proceedings the real actor was the defendant himself and not the widow and tutrix; that his relations with Simonin and his family had been close, confidential and fiduciary, and his conduct in this matter was treacherous and illegal.
That he availed himself of his intimate connection with the family to obtain possession of papers of the deceased upon which, so obtained, he bolstered up an unfounded claim against the succession, and that the case presents a condition of affairs such as to throw it under the decisions of this court in Bledsoe vs. Irwin, 33 An. 615, and Gillespie vs. Twitchell, 34 An 288.
In view of the gravity of the charges brought against defendant, and the fact that they were sustained by the judgment of the District Court, we have examined the testimony in this ease with special care, and we have reached the conclusion that the judgment can not stand. In the first place, there is nothing to warrant the statement that defendant’s relations toward Simonin and his famly were fiduciary, or that he ever obtained possession of papers illegally or improperly.
There is no doubt that the relations between all parties up to the death of Simonin, and for some time thereafter, were close and intimate, such as would naturally arise and be found between relatives, but nothing more. It is a mistake, we think, to speak of Simonin as the benefactor of the defendant. He seems, from the time he reached New Orleans, to have been industrious and self-supporting, and at the date of Simonin’s death he was a man of means.. He had unquestionably received from Simonin various acts of kindness, it being shown for instance that when wounded as a soldier he was an inmate for some time of his house. For some *1341 reason not directly disclosed, there occurred about the time of the opening of the succession an estrangement between the defendant and some of the members of the family. We do not think it arose from any dispute as to ihe claims of indebtedness which defendant has set up as due to him, but from other causes. The widow charged in her petition, and she subsequently supported the charge by an affidavit, that she did not employ Mr. Finney as an attorney, and gave no one directly or indirectly authority to do so. That fact can be conceded, and is doubtless literally true, but it does not lead up to the result which is contended for as flowing from it. Though Mrs. Simonin may not have known the “ name ” of the particular attorney who conducted the proceeding, and neither employed him herself nor gave others power to do so, we think it established that she was aware that the succession had been opened in her behalf by some attorney, though she may have been ignorant of, as she doubtless was indifferent to, his identity. We think the opening of the succession and the employment of an attorney was with her knowledge and by her consent, express or implied.
Defendant testifies that he was employed actually by Charles Parker,Mr. Simonin’s nephew, and that he recommended him. Her action (after a petition had been filed in her name, asking for confirmation as natural tutrix) in going forward and taking and subscribing her oath as tutrix indicate clearly that she was advised of the petition. It can scarcely, we think, be asserted, after a tutrix and under-tutor had been qualified, that the administration was a “pure simulation.” The succession was certainly “ opened” independently of any question as to whether the attorney who had invoked the court’s action was individually specially authorized in that behalf or not.
In the next place it is clearly shown that the widow and tutrix was informed of the fact that defendant claimed to be a creditor of the succession, and that a sale would be sought in order to pay those claims. A family meeting was convoked, of which her two stepbrothers (the Konigslows) and her nephew, Charles Parker (who was an inmate of her family), were members. Not only this, bub the under-tutor of the minors (who was their uncle) was present, approved of the proceedings and signed the same. Ignorance of this particular proceeding by the tutrix under such circumstances would be hard to believe. It is attempted to be shown by the two Konigs *1342 lows that the family meeting was itself a mere simulation — that it really did not take place as recited, but we would be slow to accept their statements as to such gross violation of duty by a sworn officer, who had no possible interest in falsifying his records. To believe this would be to bring not only the notary but all the members of the meeting and the witnesses into willingly certifying by their signatures to a state of facts which had no existence. Now, if the tutrix knew (as she undoubtedly did 'as well then as now) that Ozarnowski claimed to be a creditor of her husband and that he was about to enforce his rights, it is extraordinary if she did not at that time believe them to be well founded, and if they were, as she now says they were, pure fabrications, why she or some one of the relatives of the minor failed to say a word in opposition to the sale or to the recognition of the defendant’s pretensions. Without expense, without trouble, defendant’s whole scheme, if such it was, would have been instantly broken up. It is difficult to realize that this man’s influence and control for wrong doing extended over every person who had anything to do with this succession. It is claimed that the adjudication to the defendant of the property was for cash instead of the terms fixed by the family meeting. That was a most serious allegation, and caused us to direct our attention at once to the subject. We do not find the averment borne out. The adjudication followed the court’s order, one-half cash, one-half on credit. The adjudication is one thing — the subsequent act of sale between the parties is another. It appears that after the adjudication had been made the auctioneer who had been ordered to make the sale made a deed to the defendant in which payment of the price was provided for in a manner different from what the terms of sale called for and different from that which would have been followed had the property been bid in by a person having no connection with the succession. As it was the adjudicatee, claiming to be a heavy creditor of the succession, paid into the hands of the auctioneer one thousand and twenty-six dollars, and retained with his consent the balance, secured by special mortgage and vendor’s privilege in favor of the succession, subject to the orders of the court to be rendered upon the final homologation of the tableau or account of liquidation of the succession in case there should not be a sufficiency to meet all debts and costs having preference over and before the claims of the purchaser.
This course has been several times recognized as one authorized *1343 to be followed. It would be too late to urge this objection in this particular case now, even if it were irregular. The tableau filed, which showed that fact, was approved by the under-tutor and by the court; all the debts of the succession were paid, and the exact balance retained by the purchaser was adjudged and decreed to be due to him. The one thousand and twenty-six dollars which were actually paid by the adjudieatee was the amount of the privileged claims due by the succession.
It is charged that there was no debt due to Czarnowski at the time of the family meeting and sale. We think differently. He held possession at that time of a mortgage note of the deceased which had been secured by mortgage on this very property, and on the trial of this cause he produced the note and swore positively to the fact that he had himself, taken it up and paid it for Simonin in 1868, shortly before his death. He further swore that he had made several payments of interest upon the note, for the benefit of Simonin. He had also taken up a due bill of eight or nine hundred dollars, due by Simonin to his sister-in-law, Mrs. Parker.
Plaintiffs seek to avoid the effect of this testimony as to the mortgage note by showing that in the account filed by the executor of the succession of Pennison in 1864, this note, which had belonged to that succession, was put down as having been already at that time collected by the executor. We think this attack has been successfully met by the signed endorsement of Simonin himself on the note in 1867, showing that it was on that date extended as to payment to January, 1868. We think it quite likely, as suggested by defendant’s counsel, that the executor, willing to consider, did consider the note as so much cash in his hands, and settled with the heirs on that basis, keeping the note himself.
We need not go into any critical examination of the amount due to Czarnowski at the dates of the family meeting, or the sale, for the reason that in so far as the validity of the sale was concerned it would stand even if the amount due him was less than he claimed it to be. The succession undoubtedly had no funds in hand, and it owed debts to some extent independently of the debt* due to Czarnowski. The property was properly sent to sale to pay those debts, and if Czarnowski’s claim was smaller than he asserted it to be, the effect of that fact would be not to undo the adjudication, but to charge him with any difference there would be between the amount of his bid, *1344 the cash paid by him, and the amount actually due to him. Lynch vs. Kitchen, 2 An. 845; Gay vs. Hebert, 44 An. 306, 307; Truxillo vs. Delaune et al., 47 An. 16; Amato vs. Ermann & Cahn, 47 An. 967.
He would simply have come under a money liability for so much of the purchase price as remained unpaid, and prescription would run in his favor from the date of the homologation of the account. If prescription was permitted to accrue, the tutor was responsible for it.
Plaintiffs say it is a strange fact that the amount placed in the account as due to the defendant should have been the exact amount necessary to absorb the balance of the assets left after the payment of the privileged claim, but we see nothing suspicious in that circumstance. He had claimed to be a creditor for over nine thousand dollars, and he still claims to have been such, but as the succession was insolvent there - was no necessity to make him figure on the account for an amount larger than he could ever possibly get.
Plaintiffs say the account was homologated without the production of vouchers. This would have been of importance on an appeal, but it loses its force in an action of nullity.
The tutor and under-tutor, after the sale, both signed the final account which the tutrix presented, in which Czarnowski’s claim was recognized and ordered to be paid by the court, and after everything was closed the tutrix presented to the court, in the matter of the succession, not through John J. Finney, but through Hornor & Benedict, as her attorneys, a motion in which the fact is stated that the property of the succession had been disposed of; that it had been found insufficient to pay its debts; that there remained nothing for the minors, and that the mortgage securing her tutorship sh uld, therefore, be canceled on a piece of property in which it seems it was found she had an interest. It is claimed in this instance, again, that the attorneys who represented her had not been employed by her, but her mother; but her brother’s testimony shows the contrary. It was he who employed the attorneys, and he did so after consultation with, and with the consent of, his sister. It is not pretended they were employed by Czarnowski. We do not understand how it can be claimed that the administration of a succession was in any sense a fictitious administration, which was opened by the appointment and confirmation of a tutor and under-tutor, evidenced *1345 by their signatures, and closed by a final account, signed by the tutrix, signed and approved by the under-tutor, and homologated by the court, followed by a cancellation of the minor’s mortgage at the instance of the tutrix, through a decree taken contradictorily with the under-tutor upon an application in which the various proceedings which had taken place in the succession, and the final result thereof, were referred to. The present is not purely, as claimed, a petitory action. It was essentially necessary, in order to reach the property in litigation in this case, that actions of nullity should have been instituted within the prescriptible period, but had such actions been brought as against defendant’s title, we do not see how, under the evidence, it could have been shaken. If defendant was open at all to attack it was upon a moneyed demand, based upon his purchase, on the theory that the succession was not indebted to him to the full extent which he claimed it was.
The court below seems to have placed the defendant in the position which he would have occupied at the opening of the succession, claiming to be a creditor with his claim resisted by the widow and tutrix. Obviously this is not the position he occupies. McGehee vs. McGehee, 41 An. 657. The plaintiffs are attacking and seeking to undo accomplished facts twenty-three years after they have taken place, through regular judicial proceedings, and it is not astonishing that defendant was unable to remember or to answer the many questions propounded to him under a most rigid cross-examination, many of which questions were as to collateral and irrelevant facts.
In order to sustain plaintiff’s theory of the facts of this case, both forgery and perjury would have to be proven by them. There is nothing in this record, in our opinion, to justify the charges brought against defendant’s good name.
For the reasons herein assigned it is hereby ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of the defendant, against the plaintiffs, rejecting plaintiffs’ demand and dismissing their suit, with costs in both courts.